## LACOMBE *v.* FORSTALL'S SONS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued November 16, 17, 1887. — Decided December 5, 1887.

The respondents, holding a quantity of securities hypothecated as collateral for an indebtedness due them from an insolvent bank, sold them by public auction, in the manner stated in the opinion of the court, for less than the debt and proved the balance of the debt. When the judgment declaring a dividend was entered, it was stated in it, both parties consenting, that all the rights of both touching damages resulting from the sale of the bonds were expressly reserved. *Held*, that this could not be construed into an admission of the liability of the respondents, or that a just cause of action existed against them.

On the facts established the court *holds :* (1) That the complainants, in endorsing the bonds which are the subject of controversy as payable to bearer after the sale which is objected to, and in delivering them in that condition to the respondents, with the knowledge that they had been or were to be sold again by them, and for the purpose of enabling the respondents to transfer the bonds with a good title, must be considered to have waived any right to sue on the first sale; (2) that, conceding the first sale to have been invalid, it was nevertheless the respondents' duty to sell the bonds at as early a time as possible, and to place the proceeds in the hands of their principals in payment of the debt for which the bonds were pledged, and that they had done this with the consent and aid of the complainants; and (3) that, on the complainants' theory of the relief to which they were entitled, their remedy was at law, and not in equity.

BILL IN EQUITY. Decree dismissing the bill. Complainants appealed. The case is stated in the opinion of the court.

*Mr. W. S. Parkerson* and *Mr. Crammond Kennedy* for appellants cited: *Louisiana Savings Bank* v. *Bussey,* 27 La.

Ann. 472; *Middlesex Bank* v. *Minot,* 4 Met. 325; *Bryan* v. *Baldwin,* 52 N. Y. 232; *Bryson* v. *Rayner,* 25 Maryland, 424; *S. C.* 90 Am. Dec. 69; *Michoud* v. *Girod,* 4 How. 503; *Morgan* v. *Railroad Co.,* 96 U. S. 716, 720; *Stearns* v. *Marsh,* 4 Denio, 227; *S. C.* 47 Am. Dec. 248; citing *Cortelyou* v. *Lansing,* 2 Caines' Cas. 200; *McLean* v. *Walker,* 10 Johns. 471; *Baker* v. *Drake,* 53 N. Y. 211, 220; *Lallande* v. *Ball,* 20 La. Ann. 193; *Henshaw* v. *Bissell,* 18 Wall. 255; *Brant* v. *Virginia Coal and Iron Co.,* 93 U. S. 326; *Railroad Co.* v. *Dubois,* 12 Wall. 47; *Wilcox* v. *Howell,* 44 N. Y. 398; *Woodgate* v. *Fleet,* 44 N. Y. 1.

*Mr. Joseph H. Choate* for appellees cited: *Jacquet* v. *His Creditors,* 38 La. Ann. 863; *Milliken* v. *Dehon,* 27 N. Y. 364; *Robinson* v. *Hurley,* 11 Iowa, 410; *S. C.* 79 Am. Dec. 497; *Louisiana Savings Bank* v. *Bussey,* 27 La. Ann. 472; *Baker* v. *Drake,* 53 N. Y. 211; *Suydam* v. *Jenkins,* 3 Sandford Sup. Ct. N. Y. 614; *Shepherd* v. *Hampton,* 3 Wheat. 200; *Ormsby* v. *Copper Mining Co.,* 56 N. Y. 623; *Prince* v. *Connor,* 69 N. Y. 608; *Colt* v. *Owens,* 90 N. Y. 368; *Badillo* v. *Tio,* 7 La. Ann. 487; *Waterhouse* v. *Bourke,* 14 La. Ann. 358; *Chamberlain* v. *Worrell,* 38 La. Ann. 347.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from the decree of the Circuit Court of the United States for the Eastern District of Louisiana dismissing the bill of the complainants, who are appellants here.

The appellants are commissioners of the Mechanics' and Traders' Bank, a corporation organized under the laws of the State of Louisiana, which being in liquidation, they were appointed as such by one of the state courts of New Orleans. Before the failure of the bank, which was declared to be insolvent on the 19th day of March, 1879, there had been placed by it in the hands of Edmund J. Forstall's Sons, as agents of Baring Bros. & Co., a very considerable amount of public securities, bonds of the city of New Orleans, and coupons, under an agreement that they should hold them as security for the indebtedness of the bank to Baring Bros. & Co., an English

banking house. It is said that these securities, at the time the bill was filed, were of the value of $336,400.

It is alleged in the bill that shortly after the bank was declared to be insolvent, to wit, on or about the 22d day of May, 1879, the said E. J. Forstall's Sons fraudulently pretended to sell said bonds and thereby attempted to deprive the complainants of a large portion of the assets of the bank, which was a great wrong and detriment to the creditors and depositors. The fraud alleged in regard to this pretended sale was, that, offering the bonds without any advertisement, at a private sale, and without notice to complainants, the defendants employed one firm of brokers to sell the securities and instructed another to buy them in on account of said Forstall's Sons, as agents of Baring Bros. & Co., and that they were not sold according to the well-known usage in the city of New Orleans in such cases, nor according to the terms of the contract of pledge. They insist that this sale was made contrary to law and equity, and is therefore void as against the bank and its creditors; they protested against said sale; and that thereafter, to wit, about the 3d of March, 1880, their right to sue for said bonds and any damages arising from said illegal sale was expressly reserved in an agreement and settlement with said Forstall's Sons, as such agents, as well as by judgment rendered by the Fifth District Court, in a suit entitled *State ex rel. Wogan* v. *Mechanics' and Traders' Bank*. They further say that the bonds, which were sold for a very small amount, less than fifty per cent of their face value, are now worth in the market fully such face value, if not more.

The bill requires an answer from the defendants under oath, and appends six specific interrogatories to be answered. The relief prayed is that the pretended sale of the bonds may be decreed to be null and void, and the complainants to be their owners, and that the defendants, Edmund J. Forstall's Sons, be ordered to return them to complainants; and that in default thereof they be decreed to pay their full value of $336,400, subject to the claim of Baring Bros. & Co. against the bank of about $120,000, and for such other and further relief as the nature of the case may require.

The answer to this bill sets out a copy of the agreement under which Forstall's Sons held the securities, as follows:

"NEW ORLEANS, 11th March, 1876.

"Whereas Messrs. Baring Bros. & Co., of London, have continued in favor of the Mechanics' and Traders' Bank of New Orleans a credit of forty thousand pounds sterling, in accordance with the terms of the letter of Messrs. Baring Bros. & Co., dated 24th May, 1873, and addressed to the said bank, and confirmed by their cable of Oct. 27th, 1873, to Edm. J. Forstall & Sons: Now, in order to secure the full and punctual payment of such amount as may be or become due on account of said credit, the Mechanics' and Traders' Bank does hereby pledge to Messrs. Baring Bros. & Co., and place in the hands of Edm. J Forstall's Sons, as their representatives, the property described on the list annexed to the present.

"And it is hereby agreed that in the event of the non-payment of the amount due as above stated, Edm. J. Forstall's Sons are hereby authorized, as agents of Messrs. Baring Bros. & Co. and of the bank, to cause said pledged property to be disposed of for cash, at public or private sale, at the option of said Edm. J. Forstall's Sons, and the proceeds of said sale shall be applied to the payment of the amount due as aforesaid, with interest accrued thereon, and all commissions, costs, and charges attending said sale, the obligation of the bank for any balance that may be left uncovered by the proceeds of said sale remaining in full force.

"H. GALLY, President.
"MOSES HARRIS, Cashier.
"EDM. J. FORSTALL'S SONS, Agents."

The defendants deny any fraud in the sale of the securities, but admit that, finding it necessary on the failure of the bank to sell the bonds held under the foregoing agreement, they put them into the hands of a broker to be sold on the market in the usual way, and instructed another broker to see that they were not sacrificed, authorizing him to say that they would pay one-eighth of one per cent more for them to the purchaser than they would sell for. They claim that in this

way the securities were returned to them, and that this was done without any fraudulent purpose, but to secure the highest market price for the bonds at the sale. They further deny that they ever made any agreement by which they recognized the right of complainants in the bonds after this sale. They admit that in one or two settlements made in the Fifth District Court, in the course of the liquidation of the bank, certain reservations were made in regard to the rights of the commissioners to assert further claims on those bonds by litigation; but that they never admitted the existence of any right of recovery against these defendants. They say, however, that whatever right complainants may have had to call these defendants to account for any value in the bonds beyond that for which they were sold, was abandoned and expressly given up by the act of the complainants in endorsing the bonds under an order, obtained on the application of said commissioners, from the said Fifth District Court of the Parish of Orleans, under whose jurisdiction the bank was being liquidated; and that thereafter, on or about the 20th day of May, 1880, the complainants did endorse all said bonds to bearer under the certification and seal of office of A. Abat, a notary public, for the purpose of giving authenticity to such action. And complainants did then deliver said bonds so endorsed by them to Forstall's Sons, to be by them sold and disposed of at their free will and pleasure, without any further notice to complainants or accountability or responsibility of Baring Bros. & Co.

They further say that the said bonds were duly and regularly sold and disposed of to strangers by said Edmund J. Forstall's Sons, in good faith and in accordance with the usual and customary course of such business in New Orleans, at the dates and for the prices stated in Exhibit No. 3, annexed thereto, and that such prices were the full and fair values of said bonds at the time of sale, and the utmost and best prices that could be had or obtained for the same. Accompanying this is a schedule of the sales, with the dates, and the prices which the bonds brought. This amount was considerably less than the debt due by the bank to Baring Bros. & Co.

There is very little contradiction in regard to the facts of the case, as shown by the testimony and the pleadings. As to the question of intentional fraud in the first sale of the bonds, it is repelled by the testimony of the members of the firm of Forstall's Sons, and yet the transaction is one which it might be difficult to sustain in a court of equity. We do not feel, however, called upon, in view of other facts in the case, to decide this question. Nor do we think it necessary to pass upon the effect of what is called in the bill of complaint the right reserved to the complainants to sue the defendants on account of that transaction.

In the course of the administration of the affairs of the bank in the Fifth District Court of Orleans, it became necessary to declare dividends, and Baring Bros. & Co. asserted a claim to a share of such dividends, on account of the difference between the amount of their debt and the amount for which the securities had been sold. This difference was about forty-nine thousand dollars. In submitting to the payment of these dividends the defendants and the complainants agreed to a judgment by the Fifth District Court, which contained the following clause:

"It is further ordered, adjudged, and decreed that all the rights of both the opponents and the bank in liquidation touching the value of 180 missing coupons, and any damages resulting from the sale of the bonds of the bank in pledge by said opponents, are expressly reserved."

It is asserted by defendants that by subsequent settlements and proceedings in that court this reservation was abandoned, and that a judgment of the court on that subject is a bar to the present suit. For a reason, presently to be seen, we do not think it necessary to decide this question either. Whatever the reservation of a right to sue may mean, it cannot be construed into an admission of a liability of the defendants, or that a just cause of action existed, and it may be conceded that up to the time of the endorsement of these bonds to bearer, on the 20th of May, 1880, of which there is no denial, they were still in the possession of Forstall's Sons, under such circumstances that if the amount of the debt to Baring Bros.

& Co. had been tendered to them, and a demand made of the bonds, the plaintiffs would have been entitled to have them delivered up. No such tender was made. No such demand was made. The bonds at that time were but little, if any, more valuable than they were at the time of the first sale by Forstall's Sons.

We are of opinion that the action of the present complainants, in endorsing these bonds as payable to bearer, and delivering them in that condition to Forstall's Sons, with the knowledge that they had been or were to be sold again by that firm, and for the purpose of enabling them to transfer them with a good title, must be considered a waiver of any right to sue on account of the first sale. This endorsement, and the subsequent sale by Forstall's Sons, were in fact a waiver on both sides of the previous sale, and of any rights accruing under it, as well as a consent by both parties to the second sale.

The sales appear to have been made at different times and to different persons, each of whom became therefore an innocent purchaser for value of the bonds which are the subject of controversy. No attempt is made to impeach the fairness of these sales. It is not even charged that the prices obtained were less than the market value of the bonds sold. If the right to sell these bonds for the debt due to Baring Bros. & Co. at that time be conceded, as we think it must be, then no just complaint can be made of the sales or of the proceedings attending them. A full report of those sales, with the amounts received, and a statement of the account as thus adjusted, is set out by the answer as an exhibit.

If the complainants had chosen to stand upon their rights, or the rights of the bank, growing out of the fraud in the first sale, it may be well to consider what course they should have pursued. Treating the first sale as a fraud they might have tendered the amount due on the bonds and brought an action of replevin or sequestration. But there were two reasons why they could not do this. First, they did not have the money to tender to Forstall's Sons for the debt to Baring Bros. & Co., and second, the bonds were not worth any more in the market

than they had been sold for by Forstall's Sons, and the amount credited on the debt to Baring Bros. & Co. They might also have brought an action in the nature of tort for conversion, in which case, if they had succeeded, the value of the bonds would have been the measure of their recovery, after deducting the amount due to Baring Bros. & Co.

It is obvious, as the testimony clearly shows, that the bonds were worth but little more in a fair market at the time this endorsement was made than when they were first sold by Forstall's Sons, and that there was no right of action at law by which any sum could have been recovered worth the litigation. It is, therefore, easy to conceive that when these commissioners of the bank in liquidation asked of the court, in which that liquidation was pending, for power to endorse these bonds and deliver them to Forstall's Sons for sale, that they were doing the wisest thing that could be done at that time for the creditors of the bank, for by such sale the bank would get the benefit of all that the pledged securities were worth then in the market, and by any action at law which they could bring they could recover no more.

The complainants in this case seek to avoid all considerations of this kind by bringing a bill in equity. And, ignoring all the transactions that have taken place about the disposition of the bonds, they ask that the defendants shall be decreed to deliver up these bonds to them, and if they fail to comply with that order that they shall be held liable for the present market value, which has increased during the continuance of this controversy, and since their last sale by Forstall's Sons, to the sum of $336,400, being the par value of the various bonds and coupons.

It is clear that complainants, when they brought this action, knew very well that they could not have the relief asked for in the first part of their claim, because by their own endorsement of the bonds they had been transferred ur ler valid sales to numerous persons, who either held them as innocent purchasers for value or had parted with them to others who held them in the same character. Their only efficient prayer of relief, therefore, was for a decree against the defendants for

the value of the bonds, which they now insist must be estimated as of the time of the decree.

The first objection to this relief is, that it is simply what they could recover, if they could recover at all, in an action at law. It is the damages which, on their theory, are due for an unlawful conversion of the bonds. It is so spoken of by counsel in the argument, and the authorities referred to as furnishing the measure of damages are all in cases of actions at law for what is equivalent to a conversion of property held for another's use. We see no reason why a court of equity should be resorted to for this remedy; nor is there anything in the nature of the transaction, since no actual fraud on the part of Forstall's Sons is proved, why an action at law should not have been the appropriate one to recover these damages. The case is by no means a complex or difficult one. The facts are few and easily proved. The transactions are open and patent to everybody, and an action at law would afford complete and ample remedy for the wrong complained of.

But if we suppose that the nature of the case is one of which a court of equity has jurisdiction, as equity is administered in the Circuit Courts of the United States, then other considerations seem to forbid the relief prayed for, or any equitable relief whatever.

The first of these considerations is, that the complainants, as representing the bank and its creditors, have not only never made any tender for the purpose of redeeming these bonds, but have received their full market value as a credit on the debt to Baring Bros. & Co., to the payment of which they were devoted, as well as permitted the transaction by which these bonds were sold, and the proceeds so appropriated, to stand from May, 1880, when the sale was made, until May, 1882, when the present suit was brought, without any further effort to reclaim the bonds, and without any further protest against that sale, and without payment of any dividend on the sum for which they sold. It is obvious that during the greater part of this time, the value of these bonds was rising in the market, and the persons who had purchased them at open sale for a fair consideration were receiving the benefit of this

increase in price; but *they* were not responsible in any way to the complainants who had endorsed those bonds and thus enabled them to purchase them.

The proposition now made by complainants, that, after waiting during all this time, and seeing the bonds rise in value, they could elect to bring suit in equity when their price had risen to par, and they were worth, with the accumulated interest and coupons, nearly three times what they were sold and accounted for, is one which does not commend itself to a court of equity. It may be true that it was the misfortune of the bank that it had no money during this time to tender for the redemption of these bonds, but it is equally true that if they had made such tender, they well knew that they could not get them, because they had passed from the possession of the present defendants.

Nothing hindered them from bringing their action at law at any time. To say that they could delay for any length of time, within the period of prescription, and bring this suit in equity when the securities bore the highest price in the market, would be very unjust, even if they had given no consent and taken no part in the sale of the bonds. But when we consider, in addition, that the sale could not have been made without their consent, that they themselves procured an order of the court authorizing them to consent, and actually placed upon them the endorsement without which they could not have been sold at all, it is idle to say that they were not bound by that sale, and that now they retain a right to go upon the trustees of this pledge to recover of them the increase in the value of the securities between that time and the present.

This attempt to play fast and loose with a supposed right of action, against parties who were mere agents or trustees, and who had no interest in the cause, while through a series of years the value of the matter in contest went up and down in the scale of public market prices, does not commend itself to the conscience of any one. The truth is, that, conceding the first sale to have been simply void and ineffective, the bonds remaining in the hands of Forstall's Sons, it became

their duty to sell those bonds at as early a time as possible, and place the proceeds in the hands of Baring Bros. & Co., in payment of the obligation of the bank to them. That this has been done faithfully, and with the consent and aid of the complainants, is a sufficient answer to all that is alleged in the bill.

The decree of the Circuit Court dismissing the bill is, therefore,

*Affirmed.*